UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



U.S. Bank National Association,

Plaintiff,

—v—

Triaxx Asset Management LLC et al.,

Defendants.

16-cv-8507 (AJN)

FINDINGS OF FACT
AND CONCLUSIONS
OF LAW

ALISON J. NATHAN, District Judge:

The central dispute in this case is whether Triaxx Asset Management LLC ("Triaxx"), as

Collateral Manager of two Collateral Debt Obligations (CDOs), is required to sell certain

securities owned by the CDOs (the "Disputed Securities"). One of the senior Noteholders in the

CDOs, Pacific Investment Management Company LLC ("PIMCO"), argues that the relevant

governing contracts require Triaxx to sell securities that have been "Defaulted Securities" for

three years ("Three-Year Defaulted Securities"). Triaxx and another senior noteholder,

Serengeti Asset Management, LP ("Serengeti"), disagree, contending that the Disputed

Securities are "Credit Improved Securities," the sale of which is committed to the discretion of

the Collateral Manager. For the reasons below, the Court enters judgment in favor of PIMCO.

## I.      Procedural Background

This case was brought as a Rule 22 interpleader action by U.S. Bank National

Association ("U.S. Bank"), the Trustee and Collateral Administrator of the CDOs. As Trustee,

U.S. Bank is responsible for holding the securities in the CDOs on behalf of the Noteholders.

U.S. Bank brought this interpleader against PIMCO, Serengeti, Triaxx, the two CDOs, and

Cerberus—a Noteholder that is no longer in this action. Dkt. 1. Triaxx filed an answer as well

as a crossclaim against Cerberus, PIMCO, and Serengeti.  Dkt. 21; Dkt. 53.  Triaxx sought a

declaratory judgment on the same issue raised by U.S. Bank in its interpleader: whether Triaxx

was required to sell Three-Year Defaulted Securities, or whether it may instead exercise its

business judgment in deciding whether or not to do so.  Dkt. 21 at 19.  Triaxx also sought a

declaration from this Court that it was not required to sell securities that it had designated as

Credit Improved, even if those securities had met the definition of a Defaulted Security for three

years.  *Id.*

### A.   This Court's Prior Decision

On December 21, 2016, PIMCO and Cerberus brought a motion for judgment on the

pleadings and to dismiss Triaxx's crossclaim, arguing that the governing Indentures require the

sale of all Three-Year Defaulted Securities, including those that Triaxx had designated as Credit

Improved.  *U.S. Bank Nat'l Ass'n v. Triaxx Asset Mgmt. LLC* ("Triaxx III"), No. 16-cv-08507

(AJN), 2017 WL 3610584, at *4 (S.D.N.Y. July 26, 2017).  On July 26, 2017, this Court held

that Section 12.1(a)(ii) of the governing Indentures (the "Mandatory Sale Provision") required

the Collateral Manager to sell securities that Triaxx conceded were Three-Year Defaulted.  *Id.* at

*10.  In reaching this conclusion, the Court drew on relevant decisions by the Second Circuit and

Judge Pauley in the Southern District of New York, which held that under materially similar

Triaxx indentures, the Collateral Manager was required to sell Three-Year Defaulted Securities.

*See U.S. Bank National Association v. Triaxx Prime CDO 2006-1, Ltd. et al.* ("Triaxx I"), No.

15-cv-10172, 2016 WL 3552272, at *4 (S.D.N.Y. June 23, 2016); *U.S. Bank Nat'l Assoc. v.*

*Triaxx Asset Mgmt. LLC* ("Triaxx II"), 687 F. App'x 8, 9-10 (2d Cir. 2017).  The Court therefore

granted the motion for judgment on the pleadings as to all of the securities that Triaxx conceded

were Three-Year Defaulted.

However, the Court denied PIMCO's motion as to the securities that Triaxx argued were not Three-Year Defaulted because it had designated them as Credit Improved. PIMCO disagreed that these securities, which are the Disputed Securities at issue here, actually qualified as Credit Improved under the Indentures. The Court held that the definition of a Credit Improved Security under the governing Indentures was sufficiently ambiguous that it could not be decided on a motion for judgment on the pleadings. *Triaxx III*, 2017 WL 3610584, at *7-8. Trial was necessary to resolve the remaining disputes.

### B. The Trial

From October 15 through 17, this Court held a non-jury trial. The Court heard testimony from Mr. Sliwa, who works for U.S. Bank; Mr. Calamari, who serves as the Collateral Manager; and Dr. Tang, an analyst with Phoenix Advisors & Managers LLC ("Phoenix Advisors"), a company that provides consulting services and analysis to Triaxx. The Court also heard evidence from an expert witness offered by PIMCO, Mr. Freed, and an expert witness offered by Serengeti, Mr. O'Driscoll.

After the trial and post-trial briefing were complete, the parties submitted several letters to the Court. On January 11, 2019, PIMCO filed a letter and declaration apprising the Court of factual developments, Dkts. 151-52, while Triaxx and Serengeti opposed re-opening the record, Dkts. 153-54. On April 1, 2019, Triaxx filed a letter informing the Court of a recent decision by Judge Woods in the Southern District of New York that it argued supported its position that this case was not properly brought as an interpleader. Dkt. 155. The parties then filed a series of letters regarding the decision by Judge Woods. Dkts. 156-58.

## II. Jurisdiction

As noted above, this suit was brought by U.S. Bank as an interpleader. At trial, Triaxx

and Serengeti argued that this case was not properly brought as an interpleader. However, since the Court finds that it has federal question jurisdiction under the Edge Act, 12 U.S.C. § 632, the interpleader question is unnecessary to the resolution of the issue of subject matter jurisdiction.

This Court has subject matter jurisdiction under the Edge Act, 12 U.S.C. § 632, over the declaratory judgment cross-claim brought by Triaxx against PIMCO, Serengeti, and the Trustee. *See* Dkt. No. 21 at 6. "[T]he Edge Act provides for federal jurisdiction when (1) the case is civil in nature, (2) one of the parties is a corporation organized under the laws of the United States (i.e., a national bank), and (3) the suit arises out of transactions involving international banking or international financial operations (including territorial banking)." *Dexia SA/NV v. Bear, Stearns & Co.*, 924 F. Supp. 2d 555, 557 (S.D.N.Y. 2013) (internal quotation marks omitted). In addition, "the suit must arise out of an offshore banking or financial transaction of that federally chartered corporation." *Am. Int'l Grp., Inc. v. Bank of Am. Corp.*, 712 F.3d 775, 784 (2d Cir. 2013). This grant of jurisdiction is to be interpreted broadly. *Dexia SA/NV*, 924 F. Supp. 2d at 557 (citing *A.I. Trade Fin., Inc. v. Petra Int'l Banking Corp.*, 62 F.3d 1454, 1462 (D.C.Cir.1995)). This suit meets all the requisite criteria. The case is civil. U.S. Bank is a national bank. Ex. 171 ¶ 1. The Triaxx CDOs are organized under the laws of the Cayman Islands. Ex. 171 ¶ 2; Ex. 23 at 1; Ex. 24 at 1. And since U.S. Bank acts as trustee for the Triaxx CDOs, the suit arises out of a federally chartered corporations' international banking or foreign financial operations. This is sufficient. *See Dexia SA/NV*, 924 F. Supp. 2d at 557-59 (finding that Edge Act jurisdiction applied to dispute arising out of a national bank's issuance of RMBS for property in the Virgin Islands). Therefore, this Court has federal question jurisdiction under the Edge Act.

### III.    Burden of Proof

As with jurisdiction, the Court also finds it unnecessary to decide whether this case was properly brought as an interpleader, since even if the burden is placed on PIMCO it would still prevail.

It is true that the whether or not this case is an interpleader is related to the issue of burden of proof. In an interpleader action, each party generally bears the burden of showing, by a preponderance of the evidence, that they are entitled to the *res*. *See Metro. Life Ins. Co. v. Jacques*, No. 06-cv-444, 2009 WL 6055839 (RJA), at *5 (W.D.N.Y. Dec. 11, 2009), *aff'd*, 396 F. App'x 709 (2d Cir. 2010). As to Triaxx's declaratory judgment cross-claim, however, the burden rests with PIMCO. Because PIMCO is demanding that Triaxx sell the Disputed Securities, it would "bear [the burden] if the action were brought in due course as a claim for non-declaratory relief." *Schoeps v. Museum of Modern Art*, 594 F. Supp. 2d 461, 463-464 (S.D.N.Y. 2009). Accordingly, it bears the burden in this action for declaratory relief. *Id.*; *see also Chevron Corp. v. Salazar*, 11-cv-3718 (LAK), 2011 WL 3628843, at *7 (S.D.N.Y. Aug. 17, 2011) ("[N]othing concerning the pleading, proof and trial of the issue in respect of which a declaration is sought changes because that issue arises in the context of a declaratory judgment action."). Nonetheless, the Court finds that even assuming for the purposes of the analysis below that the burden is PIMCO's, the Court's conclusion would remain the same and PIMCO would still prevail.

## IV.     Findings of Fact

The Court makes the following findings of fact based on the trial record.[1]

### A.    The Indentures and Relevant Definitions

---

[1] To the extent that any finding of fact reflects a legal conclusion, it shall to that extent be deemed a conclusion of law, and vice versa.

The two CDOs at issue here, Triaxx 2006-2 and Triaxx 2007-1 are "special purpose investment vehicles organized under the laws of the Cayman Islands that issued CDO notes to investors, or '[N]oteholders.'" *Triaxx III,* 2017 WL 3610584, at *1. The Court will refer to Triaxx 2006-2 and Triaxx 2007-1 as "the CDOs" and "the Issuers." These CDOs are managed by a Collateral Manager, Triaxx. Dkt. No. 146 ¶ 4. The Collateral Manager's authorities and duties are governed by Indentures and Collateral Management Agreements. Dkt. No. 136 ¶ 12. Both CDOs here are governed by an Indenture and a Collateral Management Agreement, and at least with respect to the provisions relevant to this case, the contracts governing both CDOs are materially identical. Dkt. No. 146 ¶ 1. Finally, U.S. Bank serves as Trustee and Collateral Administrator for the CDOs. *Id.* ¶¶ 1-3. U.S. Bank also prepares periodic Note Valuation Reports that provide information on the status of the CDOs for the Noteholders, which include whether it classifies a security as Defaulted. Dkt. No. 136 ¶¶ 68-69.

The structure of CDOs is important to the analysis of the Indentures in this case, so the Court will discuss it briefly here. CDOs are composed of underlying securities, which in this case were Residential Mortgage Backed Securities. CDOs are then divided into tranches—from most senior to most junior—which are given descending priority in a cash flow waterfall. *See generally Triaxx I*, 2016 WL 3552272, at *1. Under the waterfall, the senior tranches receive payments first. *Id.* Noteholders purchase notes in these tranches, which will have a designation based on their seniority such as A-1 or A-2. *See* Dkt. No. 136 ¶¶ 18-21. As a result, though the details vary somewhat with the CDO, the senior noteholders generally have priority as to principal and interest payments from the underlying securities. *See id.* ¶ 20. This is particularly important if the underlying securities begin to deteriorate in value or cease making full payments. In that event, because of the waterfall, the most senior noteholders will be more likely

to be paid.  The senior tranches are therefore safer, because there is less risk that payments will be reduced even if the underlying securities begin to deteriorate.  However, because they bear less risk, the most senior tranches receive a lower rate of interest payments.  *See id.* ¶ 19.  As to the parties here, PIMCO is a more senior noteholder to Serengeti in Triaxx 2007-1.  *Id.* ¶¶ 16-18, 21.  PIMCO also holds (or controls holders of) the most senior outstanding class of notes in Triaxx 2006-2.  *Id.*  Serengeti does not hold any Notes in Triaxx 2006-2.  *Id.*  For the purposes of this case, therefore, PIMCO is a more senior noteholder than Serengeti.

The Court now turns to several relevant definitions from the Indentures.  First, the Indentures define a "Defaulted Security" as, *inter alia*, "any Collateral Debt Security . . . that is rated 'Ca' or 'C' by Moody's or is rated 'Caa3' by Moody' s and is placed by Moody's on a watchlist for possible downgrade by Moody's or has no rating from Moody's but the Issuer has obtained a credit estimate from Moody's that such Collateral Debt Security has a Moody's Rating Factor of 10,000 or higher" or "that is rated 'CC,' 'D' or 'SD' or below (or has had its rating withdrawn) by Standard & Poor's."  Ex. No. 23, 2006-2 Indenture § 1.1 at 15; Ex. No. 24, 2007-1 Indenture § 1.1 at 16-17.  Under the Mandatory Sale Provision, "the Issuer (upon the direction of the Collateral Manager to the Issuer and the Trustee) . . . shall sell . . . any Defaulted Security . . . within three years after such Collateral Debt Security became a Defaulted Security."  2006-2 Indenture § 12.1(a)(ii) at 164; 2007-1 Indenture § 12.1(a)(ii) at 171.  The Court will refer to Section §12.1(a)(ii) as the "Mandatory Sale Provision."

Turning now to Credit Improved Security, the definition of Credit Improved depends on whether the Moody's Rating Trigger is in effect, which is a reflection that the rating assigned to a class of notes has been reduced.  2006-2 Indenture § 1.1 at 13-14; 2007-1 Indenture § 1.1 at 15.  No party in this case disputes that the Moody's Rating Trigger is in effect here.  When the

7

Trigger is in effect, the Indentures define a "Credit Improved Security" as "any Collateral Debt Security that . . . (i) has been upgraded or put on a watch list for possible upgrade by one or more rating subcategories by Standard & Poor's or Moody's since it was acquired by the Issuer and (ii) has shown, in the sole judgment of the Collateral Manager (exercised in the reasonable business judgment of the Collateral Manager in good faith) significantly improved credit quality." 2006-2 Indenture § 1.1 at 13-14; 2007-1 Indenture § 1.1 at 15.  The Court will refer to these two prongs as Prong 1 and Prong 2.  As to the sale of Credit Improved Securities, Section 12.1(a) of the Indentures states that the "Issuer (upon the direction of the Collateral Manager to the Issuer and the Trustee) . . . may sell . . . any . . . Credit Improved Security . . . at any time," pursuant to a set of conditions.  2006-2 Indenture § 12.1(a)(i); 2007-1 Indenture § 12.1(a)(i) at 170.

Finally, when the Moody's Rating Trigger is in effect, the Indentures define a "Credit Risk Security" as, *inter alia*, a collateral debt security that "has been downgraded or put on a watch list for possible downgrade by any Rating Agency by one or more rating subcategories since it was acquired by the Issuer" or that "has experienced an increase in credit spread of 10% or more compared to the credit spread at which such Collateral Debt Security was acquired by the Issuer, determined by reference to the LIBOR reset for such Collateral Debt Security."  2006-2 Indenture § 1.1 at 14; 2007-1 Indenture § 1.1 at 15.  The concept of a "credit spread" refers to the "spread" between the interest rate on a security and a reference rate, such as LIBOR.  Ex. 185 ¶ 10 n. 6.

### B.   The Collateral Management Agreements

The Collateral Management Agreements lay out the Collateral Manager's responsibilities, which include ensuring that the sales described in the Indentures actually take

place.  In particular, the Collateral Management Agreements state that "the Collateral Manager agrees to . . . supervise and direct the sale, termination or assignment of Collateral Debt Securities and Equity Securities in accordance with Article XII of the Indenture."  Ex. 21, 2006-2 CMA § 2(a); Ex. 22, 2007-1 CMA § 2(a).  The Collateral Management Agreements also prohibit the Collateral Manager from taking any action "which would . . . result in the Issuer violating the terms of the Indenture in any material respect."  2006-2 CMA § 7 at 11; 2007-1 CMA § 7 at 11.  And they also state that the "Collateral Manager shall comply with such other duties and responsibilities as may be required of the Collateral Manager by the Indenture." Triaxx 2006-2 CMA § 2(o); Triaxx 2006-2 CMA § 2(o).

### C.   The Disputed Securities

At the time of acquisition, all of the securities held by Triaxx 2006-2 and Triaxx 2007-1 were rated triple-A, although some were unrated by one of the two relevant ratings agencies. Dkt. 146 ¶ 53 & Resp.  Partly as a result of the financial crisis in 2008, the Disputed Securities were downgraded significantly by the relevant ratings agencies, Moody's and S & P. *Id.* ¶ 54. The parties do not dispute that all twenty-three of the Disputed Securities have met the definition of a Defaulted Security for over three years, including two that met that definition as of April 29, 2019.  Dkt. No. 136 ¶ 11 & Resp.

The source of the primary disagreement between the parties begins with Moody's decision on June 22, 2016, to place the twenty-three Disputed Securities on a "positive credit watch" for a potential upgrade.  Dkt. 146 ¶ 15.  Acting as Collateral Manager, Mr. Calamari then classified these twenty-three securities as Credit Improved after concluding that they had shown "significantly improved credit quality."  *Id.* ¶ 16.  However, after four months, the Disputed Securities were removed from the positive credit watch.  Dkt. 136 ¶ 57 & Resp.  Furthermore, 13

9

of the 23 Disputed Securities were subsequently downgraded or ceased being rated by one or both of Moody's and S & P. Dkt. 136 ¶ 58 & Resp. While Triaxx and Serengeti claim that there is no evidence to conclude that securities that went from "rated" to "not rated" were downgraded, Mr. Calamari himself effectively admitted that in this context these securities had been downgraded. Tr. 129:21-24.

### D. Expert Testimony

Turning now to the testimony at trial, the Court heard the testimony of two expert witnesses, Mr. Freed and Mr. O'Driscoll. The Court here discusses their credibility and questions of fact relating to their testimony, while the relevance of those findings to the Court's legal analysis is set forth in Section V(b)(4) below.

Beginning with PIMCO's expert witness, Mr. Freed has substantial experience working at both a ratings agency, Moody's, and a collateral manager, Bear Sterns Asset Management. Dkt. 136 ¶ 36. The Court agrees with PIMCO that his experience rendered Mr. Freed well-placed to offer an expert opinion on the nature of CDOs and CDO indentures, as Moody's had a significant influence—both direct and indirect—on the designing and negotiation of CDOs. *Id.* ¶ 37, 39-40.

Mr. Freed testified credibly and convincingly that it was a core feature of CDOs that when securities fall below a certain rating level they would be considered defaulted and that if they remained defaulted for an extended period of time they would be sold. Dkt. 136 ¶¶ 41-43. In addition, the Court also found Mr. Freed's testimony convincing that—after an initial reinvestment period—CDOs were not generally designed to be trading vehicles. Dkt. 136 ¶ 46. Consistently with this, while the Collateral Manager had some ability to sell and purchase the securities, the Indentures were structured to allow trading only within certain narrow parameters.

Dkt. 136 ¶¶ 46-47.

As to Serengeti and Triaxx's expert, Mr. O'Driscoll, the Court found him to have even more relevant experience than Mr. Freed. Mr. O'Driscoll had years of experience drafting and negotiating CDO agreements like the Indentures at issue here. Ex. 185 ¶ 5. As such, he was well-positioned to testify as to how such agreements were typically negotiated and the relevant concerns of the drafting parties. On the other hand, the Court found Mr. O'Driscoll somewhat less credible than Mr. Freed. At times during his testimony, Mr. O'Driscoll selectively quoted certain texts in ways that were misleading. Tr. 395:15 – 397:3; Tr. 402:6 – 405:23. Mr. O'Driscoll also went back and forth on the reasonableness of designating the Disputed Securities as Credit improved. Mr. O'Driscoll testified in support of Triaxx and Serengeti's position that the Disputed Securities were Credit Improved. Ex. 185 ¶¶ 5, 63-64. Yet thirteen of the Disputed Securities were downgraded, placed on a positive watch list, and then downgraded again, Dkt. 136 ¶ 58 & Resp., and in Mr. O'Driscoll's testimony, he stated that it would be "illogical" and "inconsistent" to regard such a security as Credit Improved, Tr. 400:8-25.

Nonetheless, the Court found Mr. O'Driscoll generally credible in his testimony that CDO indentures were typically negotiated, bespoke agreements, whose terms could vary materially from deal to deal. Ex. 185 at 5; Dkt. 146 ¶ 77. Mr. O'Driscoll also presented 40 offering circulars for a number of CDOs that he found online. Dkt. 146 ¶ 76. While PIMCO argues that these circulars are of no value since circulars do not necessarily represent the final agreements that were reached, the Court considers them for what they are, which is a non-scientific sampling of offering documents that provide some insight into how such CDOs were drafted. And indeed, Mr. Freed also looked in part to these circulars in his testimony. Dkt. 146 ¶ 80. Mr. O'Driscoll's analysis of these offering circulars supported, to a certain extent, his

claim that such agreements were negotiated and individualized.  Dkt. 146 ¶ 79.  On the other hand, the circulars also confirmed the centrality of the concept of Defaulted Securities to such CDOs.  Mr. O'Driscoll estimated that "north of 95 percent of CDOs" include a definition for defaulted securities and pointed to no circulars that lacked such a definition.  Dkt. 136 ¶ 43.  Thus some of O'Driscoll's testimony was relevant and credible.

### E.   Mr. Calamari's Conflicts of Interest and Non-Credible Testimony

Turning to Mr. Calamari, who acted as Collateral Manager, the Court concludes that his determination that the Disputed Securities are Credit Improved was made for the purposes of litigation in an attempt to prevent the Disputed Securities from being sold, rather than a bona fide evaluation based on a disinterested appraisal of the securities.  The Court arrives at this conclusion for several reasons.

#### 1.   Conflicts of Interest Between Triaxx, Phoenix RES, Phoenix Advisors, and 1/0 Capital

First, the evidence and testimony produced at trial reveal that Mr. Calamari had significant conflicts of interest when he made the decision to designate the Disputed Securities as Credit Improved.  Understanding these conflicts of interest requires untangling the complex interrelationships between several entities: Triaxx, Phoenix Real Estate Solutions ("Phoenix RES"), Phoenix Advisors, and 1/0 Capital.

Beginning with Triaxx, Mr. Calamari performs effectively every role at Triaxx, including serving as chief compliance officer and general counsel.  Dkt. 136 ¶ 84.  With the exception of an administrative assistant, Mr. Calamari is Triaxx's sole employee.  *Id.*  Triaxx is owned by Triaxx Holdco, of which Mr. Calamari owns 45% and another party, Mr. Vishal Garg, owns 55%.  *Id.* ¶ 85.  Triaxx is located at 459 Broadway.  *Id.* ¶ 104.

Turning now to the two Phoenix entities, Phoenix RES has a contract with Triaxx for

12

advisory and litigation services. *Id.* ¶ 86. Mr. Garg manages Phoenix RES and Mr. Calamari previously served as general counsel to Phoenix RES. *Id.* ¶¶ 87-88. Phoenix Advisors offers analysis and support in connection with Phoenix RES's work for Triaxx, including working for Triaxx as an investment advisor. *Id.* ¶¶ 89-90. Phoenix Advisors does not service any other CDOs. *Id.* ¶ 89. Mr. Calamari was also listed as the agent for service of process for Phoenix Advisors when it was incorporated and remains its agent for service of process. *Id.* ¶ 91; Tr. 96:14-16. Phoenix Advisors and Phoenix RES are also located at 459 Broadway. Dkt. 136 ¶ 104. Triaxx has submitted invoices to the Trustee for payments to Phoenix RES, including invoices of up to $18 million. *Id.* ¶ 94. Phoenix RES is paid for its services out of proceeds of the CDO prior to payments to the Noteholders of interest and principal. *Id.* ¶ 95. There is also an escrow account containing money from litigation recoveries based on litigation that Triaxx has pursued against a variety of financial institutions. *Id.* ¶ 96. The money in this escrow account is not turned over to the CDOs, but is used to pay service providers including Phoenix Advisors and Phoenix RES. *Id.* ¶ 96. Neither the Trustee nor the Noteholders are apprised of the aggregate amount of money in this escrow account, nor how much Phoenix Advisors and Phoenix RES are being paid from this account. *Id.* ¶ 97. At one point, Dr. Tang, an analyst at Phoenix Advisors, received a special payment of $250,000 from these litigation recovery funds. *Id.* ¶ 99.

Finally, Mr. Calamari, Dr. Tang, and Mr. Garg are all partners at 1/0 Capital, which is the parent company of Phoenix Advisors. *Id.* ¶¶ 100-01. 1/0 Capital is also located at 459 Broadway. *Id.* ¶ 104. Dr. Tang testified that in his day-to-day work he does not distinguish between 1/0 Capital and Phoenix Advisors. *Id.* ¶ 102. Triaxx's continued employment of Phoenix Advisors for analysis thus benefits Mr. Calamari directly as a board member of 1/0

Capital, while the employment of Phoenix RES directly benefits Mr. Calamari's partners, including the majority owner of Triaxx Holdco, Mr. Garg. Therefore, Mr. Calamari has a material interest in preventing the sale of the Disputed Securities because they represent a source of income to separate entities with which he is deeply enmeshed. That the benefits to these entities are at times disbursed in a non-transparent manner and with priority over the Noteholders renders these conflicts only more problematic. Taken together, Mr. Calamari had significant conflicts of interest when he made his determination that the Disputed Securities did not need to be sold.

### 2. Mr. Calamari's Testimony Was Not Credible

Second, the Court also found that Mr. Calamari's testimony lacked credibility. Mr. Calamari has been materially inconsistent as to what he considers Defaulted Securities, claiming in his deposition that securities do not meet the definition Defaulted so long as they are not on a negative watch list, and therefore that the Disputed Securities were not Defaulted. Tr. 113:13 – 115:9. He then shifted positions, without explanation for why he had changed his mind to conceding that the Disputed Securities met the definition of Defaulted. Tr. 112:12 – 113:4. Mr. Calamari also testified inconsistently as to what factors he would take into account when considering whether a security was Credit Improved. In his deposition, Mr. Calamari testified that a Moody's downgrade would not factor into his determination of whether a security was Credit Improved. Tr. 124:13 – 125:9. Yet at trial he testified opaquely, even evasively, that a Moody's downgrade "would be something I would want to know" in making the Credit Improved analysis. Tr. 123: 14-24. Mr. Calamari also claimed that he determined the Disputed Securities were Credit Improved in part based on the possibility that more money would be recovered from litigation and settlements. Ex. 184 ¶ 47; Tr. 137:22 – 138:8. Yet Dr. Tang

14

testified there was "no reasonable prospect" of any such recovery for all nineteen of the Disputed Securities that he examined.  Tr. 367:8 – 368:13.  Mr. Calamari thus appears to have employed shifting and inconsistent definitions of key terms in the Indentures and apparently disregarded relevant ratings with the same goal of avoiding sale of the Disputed Securities.  Finally, from directly observing Mr. Calamari's demeanor, the Court found his answers to be evasive and non-credible.  This is further evidence that Mr. Calamari was not making his determination that the Disputed Securities were Credit Improved in good faith.

### 3. The Timing of Mr. Calamari's Determinations Further Undermine His Credibility

Finally, the Court found that the timing of Mr. Calamari's determination that the Disputed Securities were Credit Improved lends further weight to the conclusion that he did not act in good faith.  Note Valuation Reports produced by U.S. Bank consistently classified the Disputed Securities as Defaulted Securities.  Dkt. 136 ¶ 75.  The Note Valuation reports were then sent to Mr. Calamari for his review.  *Id.* ¶¶ 70-73, 75.  Under the Collateral Administration Agreements, the Collateral Manager was required to inform U.S. Bank if the information contained in the Note Valuation Reports did not conform to his information with respect to the collateral.  *Id.* ¶ 70, 73-74.  Yet Mr. Calamari did not inform U.S. Bank that he had designated the Disputed Securities as Credit Improved until this litigation.  *Id.* ¶ 74.  Furthermore, Triaxx sold several Three-Year Defaulted securities pursuant to *Triaxx I* and *Triaxx II*, that would have qualified as Credit Improved under Mr. Calamari's reading, without an objection from Triaxx that these securities were in fact Credit Improved.  *Id.* ¶ 23.  The Court infers from this timeline of events that it was in preparation for litigation that Mr. Calamari determined that the Disputed Securities met the definition of Credit Improved.  *Id.* ¶ 105.

Based on the conflicts of interest, inconsistent testimony, and the suspicious timing, the

15

Court concludes, as a matter of fact, that Mr. Calamari's determination that the Disputed

Securities were Credit Improved was not a bona fide decision based on an objective conclusion

that the securities had shown "significantly improved credit quality." 2006-2 Indenture § 1.1 at

13-14; 2007-1 Indenture § 1.1 at 15. Instead, it was an outcome-driven attempt by Mr. Calamari

to evade the sale of the Disputed Securities through a series of shifting rationalizations.

## V.   Conclusions of Law

To determine whether Triaxx must sell the Disputed Securities, the Court must decide

whether the Disputed Securities are Three-Year Defaulted, in which case they must be sold, or

whether they are instead Credit Improved, in which case their sale would be discretionary. To

make this determination, the Court addresses the following three issues in turn: (A) whether the

mandatory language of the Mandatory Sale Provision necessarily overrides the permissive

language of the Indentures with respect to the sale of Credit Improved Securities; (B) whether

the Disputed Securities count as Credit Improved under Prong 1 of the Credit Improved Security

definition; and (C) whether the Disputed Securities qualify as Credit Improved under Prong 2 of

the Credit Improved Security definition.

### A.   This Case Cannot Be Resolved Without Determining Whether the Disputed Securities Qualify as Credit Improved

Under the Mandatory Sale Provision in the Indentures, "[Triaxx]. . . shall sell . . . any

Defaulted Security . . . within three years after such Collateral Debt Security became a Defaulted

Security." 2006-2 Indenture § 12.1(a)(ii) at 164; 2007-1 Indenture § 12.1(a)(ii) at 171. As to

Credit Improved Securities, "[Triaxx] . . . may sell . . . any . . . Credit Improved Security . . . at

any time." 2006-2 Indenture § 12.1(a)(i) at 163; 2007-1 Indenture § 12.1(a)(i) at 170-71.

PIMCO argues that, as a matter of law, the mandatory "shall sell" language of the Mandatory

Sale Provision necessarily overrides the permissive "may sell" language, such that even if the

16

Disputed Securities met the definition of Credit Improved they would still have to be sold. Accordingly, PIMCO contends, the definition of Credit Improved Security is irrelevant to the disposition of this case.

The Court disagrees.

The primary issue of contention in this matter is whether the Disputed Securities are Three-Year Defaulted or Credit Improved. Triaxx and Serengeti contend that the definition of Credit Improved Security and other provisions of the Indentures permit the Collateral Manager to determine that a security that would otherwise meet the definition of Three-Year Defaulted is instead Credit Improved. If they are correct, the Disputed Securities are not Three-Year Defaulted, the Mandatory Sale Provision would not apply, and thus the question of mandatory versus permissive language would not arise in the first place. The question of whether mandatory language overrides permissive language is therefore downstream from the question of whether the Disputed Securities qualify as Credit Improved. Accordingly—and as this Court previously held in its July 26 Order—to resolve this case it is necessary to interpret the meaning of "Credit Improved Security" and determine whether the securities in question qualify as Credit Improved. *See Triaxx III,* 2017 WL 3610584, at \*6-8.

This is not to say, however, that the mandatory language of the Mandatory Sale Provision is not a critical factor in the Court's analysis. To the contrary, as Judge Pauley, this Court, and the Second Circuit all recognized, such a provision requires the sale of Tree-Year Defaulted Securities. *See Triaxx II,* 687 F. App'x at 10; *Triaxx III,* 2017 WL 3610584, at \*10. Indeed, Triaxx and Serengeti are incorrect that the Mandatory Sale Provision is discretionary because it is only triggered if the Issuers have been directed to sell by the Collateral Manager. Dkt. 146 ¶ 49. As Judge Pauley explained with respect to a similar Triaxx indenture: "the fact that such a

17

sale must take place 'upon the direction of Collateral Manager' does not give the Collateral Manager discretion to not sell a Defaulted Security within three years.  Because Triaxx 2006-1 is a special purpose vehicle with no employees, *all* of its actions must be taken upon the direction of one of its service providers." *Triaxx I*, 2016 WL 3552272, at *5.  Thus, unless some other exception applies, the Mandatory Sale Provision requires that Three-Year Defaulted Securities be sold.  Furthermore, as discussed at greater length below, the Mandatory Sale Provision also reflects a core purpose of the Indentures to protect senior Noteholders by triggering a sale when the underlying collateral deteriorates.  The Mandatory Sale Provision, and the underlying purpose it reflects, are therefore quite relevant to the Court's decision, but they are not the end of the analysis.

**B.    The Disputed Securities Do Not Satisfy Prong 1 of the Credit Improved Securities Definition**

The Court now turns to the central legal dispute in this case: whether the Disputed Securities meet the definition of a Credit Improved Security in the Indentures.  As noted above in Section I(A), once the Moody's Ratings Trigger is in effect, the definition of Credit Improved involves two prongs, both of which must be met.  The Court examines whether the Disputed Securities meet these prongs in turn.

Looking first to Prong 1, it requires that a security "has been upgraded or put on a watch list for possible upgrade by one or more rating subcategories by Standard & Poor's or Moody's since it was acquired by the Issuer."  The parties have put forward three different readings of "since it was acquired."  2006-2 Indenture § 1.1 at 13-14; 2007-1 Indenture § 1.1 at 15.  First, (1) PIMCO contends that Prong 1 is satisfied if a security has been upgraded above its rating when it was first acquired or is currently on a positive watchlist to improve above the rating at which it was acquired.  Second, (2) Triaxx and Serengeti argue that Prong 1 is satisfied if it has been

18

upgraded or placed on a positive ratings watchlist at *any point* since its acquisition—even if its

rating remains lower than when it was initially acquired.   Third, (3) Triaxx and Serengeti's

expert, Mr. O'Driscoll, at various points advanced an interpretation of Prong 1 as turning on

whether the most recent action taken was positive, meaning either a ratings upgrade or placement

on a positive watchlist—again, independent of the current rating relative to the rating at the time

of acquisition.   To determine which of these readings is correct, the Court examines the text of

the relevant provisions, the Indentures as a whole, the purpose of the Indentures, and the expert

testimony and other external evidence.

### 1. Text of Prong 1

The Court begins with the text.  *See In re AMR Corp.*, 730 F.3d 88, 98 (2d Cir. 2013).  In

its earlier decision, this Court held that the meaning of "since it was acquired" is ambiguous on

its face.  *Triaxx III*, 2017 WL 3610584, at *8.  For the same reasons, the Court continues to find

that the text of the definition could either mean (1) a security that has improved in rating relative

to its rating at the time of acquisition or placed on a watchlist to do so, or (2) a security that has

improved in rating or been placed on a positive watchlist at any point since acquisition.  *Id.*

However, while the text does not clearly indicate which of these two interpretations is

correct, it does foreclose the third definition proposed by Mr. O'Driscoll.  At times, Mr.

O'Driscoll, as well as Triaxx in its briefing on the motion for judgment on the pleadings, argued

that whether a security qualifies as Credit Improved actually depends on the most recent action: a

security that began at A, was downgraded to C, but then most recently was placed on a positive

ratings watch would qualify under Prong 1.  Dkt. 136 ¶ 53-56.  But on this account, if the same

security were to subsequently be downgraded to a D, it would be "illogical and inconsistent" for

it to be designated as Credit Improved.  Tr. 400:8-25.  Whatever its other merits might be, this is

simply not an available reading of the plain language of Prong 1, which provides no textual basis for the idea that whether a security is Credit Improved turns on its most recent status.  To adopt Mr. O'Driscoll's reading would be to impermissibly engraft new language into the text of the provision.  *See, e.g.*, *Law Debenture Tr. Co. of New York v. Maverick Tube Corp.*, 595 F.3d 458, 468 (2d Cir. 2010) ("[C]ourts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing." (quoting *Bailey v. Fish & Neave*, 868 N.E.2d 956, 959 (2007)).  The incompatibility of Mr. O'Driscoll's "recent in time" reading with the plain text of the Indentures is sufficient to reject it.

Therefore, the text of Prong 1 is consistent with PIMCO's interpretation—which is that a security is Credit Improved when its rating has improved relative to its rating at the time of acquisition—as well as Triaxx and Serengeti's reading—according to which a security is credit improved so long as its rating has improved at any point since acquisition.

### 2.  The Structure and Text of the Indentures as a Whole

To assist in resolving this ambiguity, the Court looks to the text of the Indentures as a whole, applying traditional canons of contract interpretation.  *See, e.g.*, *Law Debenture*, 595 F.3d at 468.  The Court looks to three other provisions of the Indentures for assistance in shedding light on the meaning of Credit Improved Security: (a) whether variation between the definitions of Credit Risk Security and Credit Improved Security supports either party; (b) whether either sides' reading impermissibly renders provisions of the Indentures  superfluous; and (c) whether Section 12(a)(ii) of the Indentures contemplates that securities that otherwise meet the definition of Three-Year Defaulted Securities may be retained.  The Court examines each argument in turn.

First, the Court finds that the definition of Credit Risk Security does not cut in favor of

either party.  Under the Indentures, a Credit Risk Security is defined as a security that, *inter alia*, "(y) . . . has experienced an increase in credit spread of 10% or more *compared to the credit spread at which such Collateral Debt Security was acquired by the Issuer*."  2006-2 Indenture § 1.1 at 14; 2007-1 Indenture § 1.1 at 15. (emphasis added).  Triaxx and Serengeti contend that the use of the italicized language demonstrates that the drafters knew how to indicate when a security's current status should be compared to the status at the time of acquisition.  Because the drafters did not use this explicit language in Prong 1 of the Credit Improved definition—nor in the language of branch (x) of the Credit Risk definition, which effectively mirrors the Credit Improved definition[2]—they should be assumed to have meant something different.  It is true that if parties have shown they know how to explicitly include a term in a contract, they should not be assumed to have implicitly included that term elsewhere.  *See Vysyaraju v. Mgmt. Health Sols., Inc.*, No. 12-cv-4420 (JGK), 2013 WL 4437236, at *8 (S.D.N.Y. Aug. 19, 2013); *see also Quadrant Structured Prod. Co. v. Vertin*, 23 N.Y.3d 549, 560 (2014).  Yet the language in branch (y) of the Credit Risk definition also lends some support to PIMCO's reading, since it is reasonable to read both branches (x) and (y) as referring to the same point in time.  The two branches are both trying to get at the same thing, namely whether a security has experienced sufficient downgrade for concern.  It is therefore reasonable to read them as sharing a temporal reference point.  Finally, Triaxx and Serengeti's reading of Credit Improved does not fit squarely with branch (x) of the Credit Risk definition, since on their reading a security could simultaneously meet the definition of Credit Improved (a sign of improving quality), Credit Risk

---

[2]Branch (x) looks to whether a security "has been downgraded or put on a watch list for possible downgrade by any Rating Agency by one or more rating subcategories since it was acquired by the Issuer." 2006-2 Indenture § 1.1 at 14; 2007-1 Indenture § 1.1 at 15.

(a signed of deteriorating quality), and Default (a sign of deteriorated quality). This would produce a situation where, as Triaxx and Serengeti's own expert testified, these designations—which were designed "to tell the collateral manager what they could and couldn't do"—would not provide "direction that [the Collateral Manager] could take as to what to do." Tr. 399:14-20. This incongruous result is not hypothetical; on Triaxx and Serengeti's reading, every single one of the Disputed Securities in this case meets all three definitions simultaneously. Therefore, the definition of Credit Risk Security definition lends some support to both sides' readings of Credit Improved.

Second, the rule against superfluities weighs slightly in favor of PIMCO's reading. A contract must be read "to safeguard against adopting an interpretation that would render any individual provision superfluous." *Law Debenture*, 595 F.3d at 468 (internal quotation marks omitted). Triaxx and Serengeti argue that since all of the securities acquired by these CDOs were given the highest possible rating, PIMCO's reading would render the Credit Improved provision meaningless, as none of the securities could be improved relative to their time at acquisition. However, as Mr. Freed noted, it was in fact possible for these CDOs to acquire securities that did not receive the highest rating, in part because they could be unrated at the outset by one of the ratings agencies. Dkt. 146 ¶¶ 70-72 & Resp.; Dkt. 136 ¶¶ 78-82. Such securities could therefore improve in quality relative to their rating at acquisition, with the result that PIMCO's reading does not render the Credit Improved definition entirely superfluous. And while PIMCO's reading does mean that the Credit Improved definition would have little practical effect, Triaxx and Serengeti's reading would do the same to the Mandatory Sale Provision which, as described below, is far more central to the purpose of the Indentures. As a result, this canon counts slightly more in favor of PIMCO.

22

Finally, the Court concludes that Section 12(a)(ii) of the Indentures is consistent with PIMCO's reading.  Section 12(a)(ii) states that "any Defaulted Security not sold within three years after such Collateral Debt Security becomes a Defaulted Security shall be deemed to have a Principal Balance of zero." Triaxx 2006-2 Indenture § 12.1(a)(ii) at 164; Triaxx 2007-1 Indenture § 12.1(a)(ii) at 171.  Triaxx and Serengeti contend that this provision clearly contemplates that securities that meet the definition of Three-Year Defaulted Securities may be retained, which undermines PIMCO's contention that such securities must be sold.  Yet as Judge Pauley held with respect to a materially similar provision, Section 12.1(a)(ii) refers to securities that have not been sold because the Collateral Manager has been unable to sell them. *Triaxx I*, 2016 WL 3552272, at *5.  Such a provision "does not indicate that the Collateral Manager has unfettered discretion to refrain from selling a Defaulted Security within three years." *Id.* Therefore, Section 12.1(a)(ii) is entirely consistent with PIMCO's reading.

For the reasons above, analysis of the text of the Indentures broadly and application of the traditional canons of textual interpretation does not cut strongly in either direction.

### 3. Purpose

The Court now turns to the purposes of the agreement.   The touchstone of contract interpretation is the intention of the parties. *Triaxx II*, 687 F. App'x at 10 ("The fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent." (internal brackets omitted)).  "If the document as a whole 'makes clear the parties' over-all intention, courts examining isolated provisions should then choose that construction which will carry out the plain purpose and object of the [agreement]." *Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011) (quoting *Kass v. Kass*, 91 N.Y.2d 554, 567 (1998)).  For the reasons given below, PIMCO's reading is far more consistent

23

with the plain purpose and object of the Indentures to protect the most senior noteholders if the underlying securities deteriorate.

As an initial matter, both parties agree that there is no evidence in this case of the drafting history of the Indentures, nor of the negotiations around their drafting. Dkt. 146 ¶ 73. Therefore, in determining the purposes of the Indentures, the Court looks to their overall text and structure. *See Lockheed Martin*, 639 F.3d at 69; *Law Debenture*, 595 F.3d at 467 (in general, "[t]he best evidence of what parties to a written agreement intend is what they say in their writing" (quoting *Greenfield v. Philles Records, Inc.*, 780 N.E. 2d 166, 170 (2002))). The Court is also guided in its analysis by Judge Pauley's decision in *Triaxx I* and the Second Circuit's in *Triaxx II*, which interpreted materially similar provisions in a different Triaxx indenture. And while the Second Circuit's summary order is not binding precedent, this Court affords it the considerable persuasive authority that it is due. *See LaSala v. Bank of Cyprus Pub. Co.*, 510 F. Supp. 2d 246, 274 n.10 (S.D.N.Y. 2007) (finding "the opinion of a distinguished Second Circuit panel highly persuasive . . . and eminently predictive of how the Court would in fact decide a future case such as this one" (quoting *Harris v. United Fed'n Teachers, New York City Local 2*, 02-cv-3257 (GEL), 2002 WL 1880391, at *1 n. 2 (S.D.N.Y. Aug.14, 2002)).

As every court to interpret this kind of provision in a Triaxx indenture have found, the Mandatory Sale Provision reflects that a core purpose of the Indentures was to protect the most senior noteholders if the underlying securities in the CDOs deteriorated. *See Triaxx II*, 687 F. App'x at 10 ("[A]s the district court explained, the mandatory timing of the sale 'is designed to protect the most senior noteholders (who received lower interest payments)' and who will be paid first under its waterfall payment scheme 'in the event that Triaxx 2006–1's collateral deteriorated.'" (quoting *Triaxx I,* 2016 WL 3552272, at *6)); *Triaxx III*, 2017 WL 3610584, at *8

24

(describing "the Indentures' purpose of protecting senior noteholders in case of deterioration"). The Mandatory Sale Provision ensures that deteriorating securities will be sold in a timely manner to prevent the deterioration from jeopardizing the returns to the senior Noteholders.  This purpose is not ancillary, it is fundamental to the structure of such CDOs.  It is precisely this benefit that senior noteholders bargained for, as they "received lower interest payments for the benefit of being paid out first in the event of devaluation." *Triaxx II*, 687 F. App'x at 10.  A reading that interfered with this purpose would thus subvert a core objective of the Indentures and defeat the reasonable expectations of the senior noteholders.  The parties' conflicting readings of the ambiguous language of Prong 1 must therefore be interpreted in light of this purpose. *See Lockheed Martin*, 639 F.3d at 69.

PIMCO's reading of Prong 1 is entirely consistent with the plain purpose and objective of the Indentures of protecting senior noteholders in the event of deterioration.  Under PIMCO's reading, the Credit Improved provision would not in practice interfere with the Mandatory Sale Provision, since securities that were Three-Year Defaulted would not have higher rating than at the time of acquisition, and thus not qualify as Credit Improved.  As a result, the purpose of protecting senior noteholders in a situation of deterioration would be unimpeded by PIMCO's reading.  Given the textual ambiguity, the fact that PIMCO's reading carries out a fundamental purpose of the Indentures weighs heavily in its favor.

Triaxx and Serengeti's reading, on the other hand, "would appear to seriously undermine the Indentures' purpose of protecting senior noteholders in case of deterioration." *Triaxx III*, 2017 WL 3610584, at *8; *see also Triaxx II*, 687 Fed. App'x at 10.  Their reading would turn the Credit Improved definition into a significant obstacle to the operation of the Mandatory Sale Provision, placing the sale of many securities that meet the definition of Three-Year Defaulted

entirely in the good faith business judgment of the Collateral Manager.  Yet as the Second

Circuit held in rejecting similar arguments, "Triaxx's *lack* of discretion in the timing of the sale .

. . gives effect to the parties' intent." *Triaxx II*, 687 F. App'x at 10 (emphasis added).  Indeed, on

Triaxx and Serengeti's reading, the mandatory nature of the Mandatory Sale Provision would

become permanently inoperative for any security that had improved in rating at *any* point since

acquisition.  *Triaxx III*, 2017 WL 3610584, at *8 (noting that on this reading "as long as the

economy slightly improves after a rating downgrade, Triaxx can avoid the otherwise mandatory

obligation to sell Three-Year Defaulted Securities, a result that is problematic given the purpose

underlying the mandatory sale requirement").  This would run afoul of the "canons of contractual

interpretation that counsel against" an interpretation that renders "language inoperative."  *See,*

*e.g.*, *Nautilus Ins. Co. v. Barfield Realty Corp.*, No. 11-cv-7425 (JPO), 2012 WL 4889280, at *10

(S.D.N.Y. Oct. 16, 2012) (citing *U.S. Underwriters Ins. Co. v. Affordable Housing Foundation,*

*Inc., et al.*, 256 F.Supp.2d 176, 181 (S.D.N.Y.2003)).  Indeed, this canon has particular force

here, given the centrality of the Mandatory Sale Provision to the purpose of the Indentures.  *See,*

*e.g.*, *Triaxx II*, 687 F. App'x at 10.

      More problematic still, this sweeping grant of discretion to the Collateral Manager could

be triggered by what is effectively a non-event, such as placement and removal from a positive

watchlist without an actual upgrade—even if the removal from the positive watchlist was then

followed by three uninterrupted years as a Defaulted Security, or a further downgrade.  While it

true that to qualify as Credit Improved a security would still need to meet Prong 2, this is simply

another way of saying that it is up to the Collateral Manager's good faith business judgment—

similar to the argument that the Second Circuit rejected.  *See Triaxx II*, 687 F. App'x at 10

(Triaxx's argument that sale would only be required based on determination by Collateral

Manager that it was "commercially reasonable" impermissibly "undermines the terms of the contract as well as the waterfall payment scheme that the parties agreed to"). Triaxx and Serengeti's interpretation of Prong 1 is therefore contrary to a fundamental purpose of the Indentures.

In the face of this, Triaxx and Serengeti argue that an important purpose of the governing agreements was to give significant discretion to the Collateral Manager. The courts in *Triaxx I* and *Triaxx II* already rejected a similar reading of similar Triaxx indentures, for reasons this Court finds persuasive. As to the Collateral Management Agreements, the Court finds that they would not override the terms or purpose of the Indentures. The Collateral Manager Agreements repeatedly caveat that the authority and duties of the Collateral Manager are subject to the terms of the Indentures. *See* Triaxx 2006-2 CMA § 2(o), §7; Triaxx 2006-2 CMA § 2(o), §7. This language expressly recognizes the possibility of conflicts between the Indentures and the authority and duties laid out in the Collateral Management Agreements and make clear that in such instances the Indentures govern. *See Triaxx I*, 2016 WL 3552272 at *5. Therefore, even if certain provisions of the Collateral Management Agreements could be read to support Triaxx and Serengeti's position, to the extent they are inconsistent with the Indentures they must still give way.

As to the specific provisions of the Collateral Manager Agreements that Triaxx and Serengeti point to, these provide little support for Triaxx and Serengeti's arguments. Triaxx and Serengeti assert that under the section "General Duties of the Collateral Manager," the Collateral Manager "shall determine" whether a security is, *inter alia*, a Defaulted Security or a Credit Improved Security. Triaxx 2006-2 CMA § 2(f); Triaxx 2007-1 CMA § 2(f). Yet these general duties do not nullify the specific language of the Mandatory Sale Provision. *See Triaxx I*, 2016

WL 3552272 at *6 (rejecting a similar argument based in the general duties of the Collateral

Manager).  Triaxx and Serengeti also point to the language of Section 2(d)(vii) of the Collateral

Management Agreement, which states that the Collateral Manager may "waive any default,"

which they contend means that he can waive a security's status as a Three-Year Defaulted

security.  Yet as the term "default" is not defined in Section 2(d)(vii), it is not clear this language

refers to Defaulted Securities as they are specifically defined in the Indentures, or rather to the

more commonplace use of default, which could refer to the underlying collateral or mortgages.

Dkt. 146 ¶ 52 & Resp.  Indeed, the term "default" in Section 2(d)(vii) is not capitalized, while

Indentures typically capitalize the term when referring to "Defaulted Securities," *see, e.g.*, 2006-

2 Indenture § 12.1(a)(ii) at 164; 2007-1; Indenture § 12.1(a)(ii) at 171, which lends further

weight to the conclusion that the term is being used in its ordinary sense.    The Collateral

Manager's discretion under Section 2(d)(vii) is also expressly "subject to and in accordance with

the Indenture."  Most importantly, allowing the Collateral Manager to waive *any* default would

impermissibly render the "shall sell" language of the Mandatory Sale Provision effectively

inoperative.  *See, e.g.*, *Nautilus Ins. Co.*, 2012 WL 4889280, at *10.  At their base, these are

simply reformulations of the same argument that the Mandatory Sale Provision, despite its plain

text and its fundamental role in the Indentures, is *de facto* left to the Collateral Manager's

discretion.  For the same reasons as above, these arguments therefore fail.

　　　　Finally, not only is Triaxx and Serengeti's reading at odds with the purpose of the

Indentures, it would also produce illogical and inconsistent results.  Traditional "canons of

construction forbid contractual interpretations that lead to absurd results."  *Gorman v. Consol.*

*Edison Corp.*, 488 F.3d 586, 596 n.9 (2d Cir. 2007) (internal quotation marks omitted)).

According to Triaxx and Serengeti's reading, if a defaulted security is upgraded, then

subsequently downgraded, it could still qualify as Credit Improved.  Yet their own expert, Mr. O'Driscoll, stated that "it's inconsistent and illogical if the security has been upgraded and then downgraded to actually take the view that the thing is still credit improved." Tr. 400:8-25.  Quite so.  It would be more illogical still for a security to sink to the level of Defaulted, then be placed on a positive watchlist for a few months but never actually upgraded, then subsequently downgraded and somehow still qualify as Credit Improved under Prong 1.  Prong 1 is based only on ratings and the rating of such a security has in no sense been *improved*.  Nor does its rating history indicate that it has any current prospect of being so improved.  This possibility is not merely hypothetical—it describes the trajectory of thirteen of the twenty-three Disputed Securities.  Dkt. 136 ¶¶ 58-59.[3]  That Triaxx and Serengeti's reading is, in the judgment of their own expert, "inconsistent and illogical," further undermines their claim.

For the reasons above, the clear, core purpose of the Indentures to protect the most senior noteholders in the event of deterioration weighs heavily in PIMCO's favor.

### 4.  Expert Testimony, External Evidence, and Course of Conduct

Finally, the Court turns to the testimony of the two experts, the evidence they presented, and the parties' course of conduct under the Indentures.  As a threshold matter, the Court notes that, while useful, this evidence is of considerably less weight than the Court's analysis of the purpose of the Indentures, as evidenced by their text and structure.  Neither party has submitted sufficient evidence to prove trade usage. *British Int'l Ins. Co. v. Seguros La Republica, S.A.*, 342 F.3d 78, 84 (2d Cir. 2003) ("[T]rade usage must be so well settled, so uniformly acted upon, and so long continued as to raise a fair presumption that it was known to both contracting parties and

---

[3] As to PIMCO's purported factual developments regarding the status of some of the Disputed Securities, Dkt. 151-52, the Court finds it unnecessary to reopen the record and they play no part in the Court's decision.

that they contracted in reference thereto." (internal quotation marks omitted)).  Nonetheless, the expert opinions are of some limited relevance to determining whether a given interpretation of the contract would be "absurd, commercially unreasonable, or contrary to the reasonable expectations of the parties." *Homeward Residential, Inc. v. Sand Canyon Corp.*, 298 F.R.D. 116, 129 (S.D.N.Y. 2014) (quoting *Landmark Ventures, Inc. v. Wave Sys. Corp.*, No. 11-cv-8440 (PAC), 2012 WL 3822624, at *3 (S.D.N.Y. Sept. 4, 2012)).  For the reasons given below, the experts and their evidence lend further support to PIMCO's reading.

Given the Court's relevant determinations of credibility and Mr. O'Driscoll's at times inconsistent testimony, the expert testimony weighs in PIMCO's favor.  Mr. Freed's expert testimony buttresses the conclusions of this Court that the Mandatory Sale Provision was a central element of such CDO indentures.  Dkt. 136 ¶¶ 42-48.  As to Mr. O'Driscoll's testimony, on the whole, it did more to call into question Triaxx and Serengeti's reading than to support it. At moments, Mr. O'Driscoll advanced a "most recent in time" theory that was different from Triaxx and Serengeti's, in part because, as noted above, he testified that Triaxx and Serengeti's theory would lead to results that were illogical and inconsistent.  Taken in the balance, this evidence lends some weight to PIMCO's reading.

As to the two experts' analyses of the 40 offering circulars introduced by Mr. O'Driscoll, these also lend some support to PIMCO.  These circulars did indicate some variation among these agreements, supporting Mr. O'Driscoll's testimony that such agreements were negotiated and to a certain extent individualized.  But these circulars did not in any meaningful way detract from the conclusion that mandatory sale of defaulted securities was an important element of such CDO indentures.  To the contrary, all of the circulars introduced included a definition of Defaulted Security and both experts testified that the vast majority, if not all, CDO indentures

included such a definition.  *See* Section IV(d).  Triaxx and Serengeti point to one offering

circular, BFC Ajax, which explicitly adopts PIMCO's reading into its definitions of Credit

Improved Security.  Dkt. 146 ¶ 69.  Triaxx and Serengeti contend that this is evidence that the

absence of such language in these Indentures reflected an intent to employ a different

definition—or at least that PIMCO's reading was not so obvious that it could go unstated.  *Id*.

Yet without showing that the drafters of the Triaxx Indentures were aware of the language of

these other circulars, it is entirely speculative that any variation was intentional.  Furthermore,

the BFC Ajax circular can in fact be taken as some evidence that PIMCO's reading was

reasonable enough to be adopted by other CDOs, particularly since Mr. O'Driscoll conceded that

he could identify no circular that explicitly stated that securities actually could simultaneously

meet the definition of Credit Improved and Defaulted.  Dkt. 136 ¶ 51.  Mr. O'Driscoll also

pointed to the Barrington II offering circular as another example of a circular that expressly

adopted PIMCO's reading.  Tr. 395:15-17.  Yet the Barrington II language to which Mr.

O'Driscoll pointed is of limited relevance, since—unlike here—it did not refer to a situation

when the equivalent to the Moody's Rating Trigger was in effect.  Ex. 39, 2844-45.  And even if

the Barrington II language was more analogous, it still would not cut in favor of Triaxx and

Serengeti for the same reasons as with the BFC Ajax circular.  Therefore, the circulars on the

whole lend some limited support to PIMCO.

     Finally, the parties' course of conduct also provides some further confirmation of

PIMCO's position.  *See New York Marine & Gen. Ins. Co. v. Lafarge N. Am., Inc.*, 599 F.3d 102,

119 (2d Cir. 2010) ("Conduct of the parties provides another important source for deriving their

intent as to the meaning of the contracts at issue.  There is no surer way to find out the intent of

the parties to a contract than to see what they have done." (internal brackets and ellipses

omitted)).  As noted above in Section IV(e)(3), up until this litigation, the parties' course of conduct was to treat the Disputed Securities as Defaulted, not Credit Improved.  This lends some limited weight to PIMCO's readings.

For all the reasons above, the Court concludes that "has been upgraded or put on a watch list for possible upgrade by one or more rating subcategories by Standard & Poor's or Moody's since it was acquired by the Issuer" refers back to a security's rating at the time of acquisition. 2006-2 Indenture § 1.1 at 13-14; 2007-1 Indenture § 1.1 at 15.  Since none of the Disputed securities have been upgraded or placed on a watch list for possible upgrade above their rating at the time of acquisition, none of them meet the first prong of the definition of a Credit Improved Security.  Since a security must meet both prongs of the definition of Credit Improved, none of the Disputed Securities are properly so-designated.  All of the Disputed Securities are therefore Three-Year Defaulted Securities as of April 29, 2019.  Dkt. No. 136 ¶ 11 & Resp.  Accordingly, all of the Disputed Securities must be sold under the Mandatory Sale Provision.

### C.  The Disputed Securities Do Not Satisfy Prong 2 of the Credit Improved Securities Definition

In the alternative, the Court concludes that the Disputed Securities are not Credit Improved on the independent ground that the Collateral Manager did not make a good faith determination that the Disputed Securities were Credit Improved.

Prong 2 of the Credit Improved Security definition requires that a security have "shown, in the sole judgment of the Collateral Manager (exercised in reasonable business judgment of the Collateral Manager in good faith) significantly improved credit quality."  2006-2 Indenture § 1.1 at 13-14; 2007-1 Indenture § 1.1 at 15.  The Indentures do not provide any specific definition for "good faith," and as Black's Law Dictionary notes "[t]he phrase 'good faith' is used in a variety of contexts, and its meaning varies somewhat with the context." GOOD FAITH, Black's Law

Dictionary (10th ed. 2014) (quoting Restatement (Second) of Contracts § 205 cmt. a (1979)).

Nonetheless, the general legal definition of "good faith" includes "honesty in belief or purpose"

and "faithfulness to one's duty or obligation." *Id.* In addition, courts have also found that in the

context of corporate officers, conflicts of interest—particularly ones that are not apparent and not

fully disclosed—indicate an absence of good faith. *See Keehan v. Keehan*, No. 96-cv-2481

(PKL), 2000 WL 502854, at *4 (S.D.N.Y. Apr. 25, 2000) (under New York law, an "officer or

director of a corporation is required to perform his duties in good faith" which includes "an

undivided loyalty and an allegiance that is influenced by no consideration other than the welfare

of the corporation"), *id.* at *6 (full disclosure of conflicts of interest is "minimal requirement" to

show good faith) (citing cases); *see also T. G. I. E. Coast Const. Corp. v. Fireman's Fund Ins.

Co.*, 534 F. Supp. 780, 782 (S.D.N.Y. 1982) ("the possibility of a conflict of interest, raise[s] a

genuine issue as to whether [Plaintiff] carried out its duty to act in good faith"); *Alphonse Hotel

Corp. v. Nam Tran*, No. 13-cv-7859 (DLC), 2014 WL 3801230, at *9 (S.D.N.Y. Aug. 1, 2014),

*aff'd sub nom. Alphonse Hotel Corp. v. Tran*, 828 F.3d 146 (2d Cir. 2016) (in context of

fiduciary obligations more generally, existence of conflicts of interest shifts burden to the

interested parties to prove good faith).

In the context of these Indentures, Mr. Calamari's actions failed to meet a standard of

good faith. The Collateral Manager is vested with the responsibility of faithfully managing the

CDOs consistently with the Indentures. *See* Triaxx 2006-2 CMA § 2(o), §7; Triaxx 2006-2

CMA § 2(o), §7. Yet as the Court found in Section IV(E), when Mr. Calamari designated the

Disputed Securities as Credit Improved he was not trying to faithfully carry out his

responsibilities as Collateral Manager. Instead, Mr. Calamari sought to circumvent his duties

through a series of shifting, opportunistic readings of the Indentures. In doing so, he was not

acting faithfully or forthrightly.  The Court reaches this conclusion based on: Mr. Calamari's significant conflicts of interests about which he was less than fully forthcoming and transparent; Mr. Calamari's lack of credibility on the stand as well as his shifting descriptions of his actions and decision-making process; and the suspicious timing of Mr. Calamari's designation of the Disputed Securities as Credit Improved.  Accordingly, the Court holds that Mr. Calamari was not acting in good faith when he determined that these securities had shown significantly improved credit quality.  Therefore, the second prong of the Credit Improved definition is not met in this case, providing an independent ground for concluding that the Disputed Securities are not Credit Improved.

## VI.   Conclusion

For the reasons above, the Court holds that the Disputed Securities do not meet the definition of Credit Improved Security in the governing Indentures.  All of the Disputed Securities are therefore Three-Year Defaulted and must be sold immediately under the Mandatory Sale Provision.  The Clerk of Court is directed to enter judgment in PIMCO's favor and close the case.

SO ORDERED.

Dated: September ___, 2019
      New York, New York

_____
ALISON J. NATHAN
United States District Judge

34