UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



U.S. Bank National Association,

Plaintiff,

—v—

Triaxx Asset Management LLC, *et al.*,

Defendants.

16-cv-8507 (AJN)

OPINION & ORDER

ALISON J. NATHAN, District Judge:

Interpleader Defendants Triaxx Asset Management and Serengeti Asset Management (collectively, the Movants) move for a stay of enforcement of this Court's September 16, 2019 Order and Judgment pending appeal to the Second Circuit. The Court concludes that the Movants may be irreparably harmed absent a stay. However, the Movants have not shown a likelihood of success on the merits, and a stay would harm other parties to this litigation. The Court therefore DENIES the motion for a stay of enforcement.

I.     **BACKGROUND**

The Court recounted the facts of this case at length in its Findings of Fact and Conclusions of Law. *See* Dkt. No. 159. The Court presumes the parties' familiarities with those facts. In short, U.S. Bank National Association (U.S. Bank) is the Trustee and Collateral Administrator of two Collateral Debt Obligations (CDOs). Triaxx serves as the Collateral Manager for these CDOs. The CDOs are composed of underlying securities and they have issued notes to investors. Two of the noteholders, PIMCO and Serengeti, are parties to this action. PIMCO is the senior-most noteholder in both CDOs. In 2016, U.S. Bank brought this case as an

1

interpleader under Federal Rule of Civil Procedure 22. The crux of the dispute is whether Triaxx is contractually obligated to sell certain securities (the Disputed Securities).

The Court held a bench trial from October 15 to 17, 2018. On September 19, 2019, the Court issued its Findings of Fact and Conclusions of Law. The Court concluded that it had federal-question jurisdiction under the Edge Act. Dkt. No. 159 at 4; *see* 12 U.S.C. § 632. The Court then directed judgment in PIMCO's favor and ordered that the Disputed Securities be sold immediately. Dkt. No. 159 at 34. Triaxx and Serengeti appealed that decision to the Second Circuit and now seek to stay its enforcement in the interim. *See* Dkt. Nos. 162-165. U.S. Bank and PIMCO oppose the stay.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 62(c) gives District Courts discretion to stay an injunction during the pendency of an appeal. In deciding whether to grant a stay, courts consider the following factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *In re World Trade Center Disaster Site Litig.*, 503 F.3d 167, 170 (2d Cir. 2007) (quoting *Hilton v. Braunskill*, 481 U.S. 770 (1987)). The moving party bears the heavy burden of establishing that these factors weigh in its favor. *See Barcia v. Sitkin*, 2004 WL 691390, at *1 (S.D.N.Y. 2004) ("The burden of establishing a favorable balance of these factors is a heavy one and more commonly stay requests will be denied for not meeting the standard.").

Courts apply these criteria on a sliding scale. The Second Circuit has explained that "the necessary level or degree of possibility of success will vary according to the court's assessment

of the other stay factors... the probability of success that must be demonstrated is inversely proportional to the amount of irreparable injury plaintiff will suffer absent the stay. Simply stated, more of one excuses less of the other." *Thapa v. Gonzales*, 460 F.3d 323, 334 (2d Cir. 2006) (internal quotation marks and alterations omitted). A court may therefore require "a lesser showing of harm if [the movant] is likely to succeed on the merits and demand a more substantial showing of harm if the likelihood of success is low." *Purdue Pharma L.P. v. Endo Pharm. Inc.*, 2004 WL 306591, at *1 (S.D.N.Y. Feb. 17, 2004). Nonetheless, irreparable harm and likelihood of success on the merits remain "the most critical" factors in this inquiry. *Nken v. Holder*, 556 U.S. 418, 434 (2009) ("The first two factors of the traditional standard are the most critical."). A stay is an "intrusion into the ordinary processes of administration and judicial review, and accordingly is not a matter of right." *Id.* at 427; *see also MaldonadoPadilla v. Holder*, 651 F.3d 325, 327-28 (2d Cir. 2011). It is instead "an exercise of judicial discretion, and the propriety of its issue is dependent upon the circumstances of the particular case." *Nken*, 556 U.S. at 433 (internal quotation marks omitted).

### III. THE MOVANTS ARE NOT ENTITLED TO A STAY

The Court reviews each of the factors in turn. It concludes that the Movants have not shown a likelihood of success on appeal, Serengeti will be irreparably injured absent a stay, and PIMCO may face injury if the Court orders a stay. After weighing these factors, the Court concludes that the Movants are not entitled to a stay.

#### A. The Movants Have Not Shown A Likelihood of Success on the Merits

The first factor, a showing of a likelihood of success on appeal, requires "more than a mere possibility of relief." *Nken*, 556 U.S. at 434. To demonstrate a "strong showing that it is likely to succeed on the merits," the Movants have the burden of demonstrating "a *substantial possibility*, although less than a likelihood, of success" on appeal. *Mohammed v. Reno*, 309 F.3d

3

95, 101 (2d Cir. 2002) (emphasis added); *accord In re Elec. Books Antitrust Litig.*, 2014 WL 1641699, at *7 (S.D.N.Y. Apr. 24, 2014). The Movants have failed to meet this burden.

The Movants do not contend that the Court erred in holding that the governing contracts require Triaxx to sell the Disputed Securities. Instead, they argue that the Court erred in holding that the Edge Act creates subject-matter jurisdiction to decide this case. The Edge Act "provides for federal jurisdiction when (1) the case is civil in nature, (2) one of the parties is a corporation organized under the laws of the United States (i.e., a national bank), and (3) the suit arises out of transactions involving international banking or international financing operations (including territorial banking)." *Dexia SA/NV v. Bear, Stearns & Co.*, 924 F.Supp.2d 555, 557 (S.D.N.Y. 2013) (internal quotation marks omitted); *see* 12 U.S.C. § 632. In its Order, the Court concluded that all three requirements for Edge Act jurisdiction were satisfied: this is a civil case, U.S. Bank is a national bank, and U.S. Bank acts as the Trustee for the CDOs.

The Movants now claim that the Court improperly premised its jurisdiction on an "inoperative pleading," Triaxx's original Answer and Cross-Claim. *See* Dkt. No. 21. That pleading was later amended, and the amended pleading did not assert a claim against U.S. Bank. Movants Br., Dkt. No. 164, at 2; *see* Dkt. No. 53 (amended pleading). Because there is "no operative claim involving U.S. Bank" in this case, argue the Movants, the Edge Act does not create jurisdiction. Movants Br. at 2. Both U.S. Bank and PIMCO contend that this argument is a "red herring" because Triaxx's "declaratory judgment claim arises out of banking activity on behalf of foreign entities and *expressly* seeks to bind judgment on the Trustee," and thus triggers Edge Act jurisdiction. U.S. Bank Br., Dkt. No. 168, at 5; PIMCO Br., Dkt. No. 172, at 11.

To be sure, Triaxx's amended pleading does not formally assert a cross-claim against U.S. Bank. *See* Dkt. No. 53 at 6. But the non-movants are correct that the distinction between

the two pleadings is one without a difference. To start, Triaxx's amended pleading states expressly that "Triaxx is entitled to a declaratory judgment, which declaration should be binding upon all the Noteholders and the Trustee [U.S. Bank]." Dkt. No. 53 ¶ 97. Even though Triaxx did not formally raise a cross-claim against U.S. Bank, therefore, it directly asked the Court to issue a judgment binding on U.S. Bank.

Moreover, the Movants misconstrue the jurisdictional inquiry under the Edge Act. *Allstate Ins. Co. v. CitiMortgage, Inc.* is instructive in this regard. 2012 WL 967582 (RJS) (S.D.N.Y. March 13, 2012). There, Plaintiffs purchased from Defendants residential mortgage-backed securities, and alleged that Defendants had made false and misleading statements in their offerings. *Id.* at *1. Plaintiffs brought various state-law claims in state court, and Defendants removed on the basis of the Edge Act, arguing that some of the RMBS contained loans originating in Puerto Rico. *Id.* at **1, 3. The Court found that the Edge Act did not confer jurisdiction because the federally chartered bank was not a party to the securities containing Puerto Rican mortgages. *Id.* at *3. The Court explained that "a nationally chartered bank must have potential liability on claims arising out of transactions involving international or foreign banking . . . in order to support jurisdiction under the Edge Act." *Id.* at *4. For jurisdiction to attach, "the national bank [must be] potentially liable to [another party] on any claims arising from" the international transactions. *Id.*

This standard is met here. In its amended pleading, Triaxx asks the Court to issue a declaratory judgment binding on U.S. Bank. Although the Issuers own the Disputed Securities, they are pledged to U.S. Bank in order to secure the Issuers' obligations. U.S. Bank is the custodian of the Securities, and holds a lien over them on behalf of Noteholders. Under the Court's order, therefore, the sale can be effectuated only if U.S. Bank releases its lien on the

Disputed Securities. Although the Court's order will not create monetary liability for U.S. Bank, it does change its rights and obligations—just as the *Allstate* Court could *not* have done with the relevant entity. This is sufficient to create Edge Act jurisdiction.

Moreover, Edge Act jurisdiction does not require that the relevant transaction be central to the claim or theory of recovery. For example, in *Kirschner v. JPMorgan Chase Bank*, the Court made clear that "there is no threshold dollar amount or percentage required under the text of the Edge Act or Second Circuit case law . . . to establish the 'foreign or international' element for Edge Act jurisdiction." 2018 WL 4565148, at *8 (S.D.N.Y. 2018). In that case, even a relatively small percentage of the total transaction that was foreign in nature sufficed to establish jurisdiction. *Id.*; *see also Ritchie Capital Mgmt., L.L.C. v. JPMorgan Chase & Co.*, 532 B.R. 461, 467 (S.D.N.Y. 2014) (rejecting argument that transactions must be "central to the claim" for jurisdiction to exist under the Edge Act, and observing that the Second Circuit in *AIG* "apparently was not concerned that the territorial nexus was based on a 'tiny percentage' of mortgages at issue) (citing *AIG*, 712 F.3d at 783-84). Similarly, the District Court in *Pinto v. Bank One Corp.* stated that "[a] suit satisfies the jurisdictional requisites of [the Edge Act] if any part of it arises out of transactions involving international or foreign banking." 2003 WL 21297300 at *3 (S.D.N.Y. 2003). "Indeed, federal courts in this Circuit have consistently interpreted the Edge Act's jurisdictional provision broadly, routinely appl[ying] [the statute,] even in cases based on state law causes of action and containing only an incidental connection to banking law, and even though the international or foreign banking activity was not central to the case." *Bank of Am. Corp. v. Lemgruber*, 385 F. Supp. 2d 200, 214 (S.D.N.Y. 2005) (citations and internal quotation marks omitted).

Here, the foreign nature of the CDOs are sufficient to confer jurisdiction. As the Court has explained, the Issuers are parties to this action and based in the Grand Cayman. The foreign Issuers own the Collateral Debt Securities, but those Securities are pledged to U.S. Bank in order to secure the Issuers' obligations under the governing contracts. U.S. Bank also holds a lien over the securities. Prior to any sale, U.S. Bank must take action to release this lien. Ex. 23, 24 §§ 10.8, 12.1. The Mandatory Sale Provision at issue here thus makes "both [U.S. Bank] and the Cayman Islands-based Issuers . . . integral to the Collateral Manager's duty to sell Three-Year Defaulted Securities." PIMCO Br. 14 (citing Triaxx 2007-1 Indenture § 12.1(a)(ii), Ex. 24 at 1410)). This satisfies the international-nexus requirement. For example, in *Luby's Fuddruckers Restaurants, LLC v. Visa Inc.*, the District Court held that "a direct nexus between the qualifying transaction and an Edge Act corporation" existed where a transaction "*required participation* of [the Edge Act bank] and the [foreign bank.]" 342 F. Supp. 3d 306, 318 (E.D.N.Y. 2018) (emphasis added); *see also Kirschner*, 2018 WL 4565148, at *8 ("The case law indicates . . . that a transaction between an Edge Act bank and a foreign counterparty is sufficient to establish an international nexus."). Although the relevant transactions here are not exclusively between an Edge Act bank and a foreign counterparty, U.S. Bank must participate directly in any potential sale. In short, the intricate web of financial connections linking the parties together and implicated by any potential sale contains the requisite foreign elements, and is sufficient to confer jurisdiction under the Edge Act.

### B. Absent a Stay, Serengeti Will Face Irreparable Injury

The next factor requires the Court to decide whether the Movants will be irreparably harmed absent a stay. Irreparable harm must be "neither remote nor speculative, but actual and imminent." *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 975 (2d Cir. 1989) (internal quotation marks and citation omitted). Injuries fully remedied by monetary damages do

7

not constitute irreparable harm. *See Borey v. National Union Fire Ins. Co. of Pittsburgh*, 934 F.2d 30, 34 (2d Cir. 1991).

The Movants raise two theories of irreparable harm. They first argue that they will be irreparably harmed because immediate sale of the Disputed Securities will moot any appeal of the Court's Order. The Movants claim that this Court had no authority to order the sale of the Disputed Securities because it lacked subject-matter jurisdiction. If the sale is allowed to proceed, they argue, the issue of whether the Court had authority to order it in the first instance will be moot.

The Movants are incorrect. As U.S. Bank and PIMCO explain, there are multiple Defaulted Securities in the CDOs that are not yet—but eventually will be—Three-Year Defaulted Securities. For example, they point to Security I.D. 16163FAA3 in Triaxx 2006-2, which will become a Three-Year Defaulted Security on June 6, 2020 and only then require sale. PIMCO Br. at 19. Even after a sale ordered by this Court's September 30, 2019 Order, therefore, this case will continue to present a live case and controversy. The Movants could still obtain meaningful relief: a reversal from the Court of Appeals would mean that they would not be required to sell the securities identified by U.S. Bank and PIMCO.

The Movants next argue that a sale will irreparably harm Serengeti. They are correct. Assume the following: the Court does not enter a stay, the Disputed Securities are sold, and the Second Circuit then reverses this Court's decision. In this hypothetical, Serengeti would have no way to return to its original position. As the Movants explain, there is no mechanism by which the CDOs could "repurchase any securities, let alone the Disputed Securitas, since the time the CDOs had to purchase new assets . . . has long expired." Movants Br. at 8. Moreover, the "CDOs are incapable of raising new funds to repay lost principal and interest to Serengeti and

the Indentures' strict payment waterfalls provide no mechanism for redirecting any such payments to Serengeti." Movants Reply Br., Dkt. No. 173, at 3. In other words, if the Movants prevail on appeal, there would be no way for the CDOs to repurchase the Disputed Securities or recoup the related cash flows, thereby restoring the status quo ante. A future court therefore would not be able to "'unscramble the eggs' and return the [Movants] to the positions they would have occupied" before the sale. *See Solus Alternative Asset Mgmt. LP v. GSO Capital Partners L.P.*, 2018 WL 620490, at *5 (S.D.N.Y. Jan. 29, 2018). The Movants will thus be irreparably harmed without a stay. This factor thus counsels in favor of a stay pending appeal.

### C. A Stay Will Injure PIMCO

The Court must next consider whether non-movants will be harmed by a stay. In evaluating the prospect of such injury, the measure is not irreparable harm, but instead substantial harm. *LaRouche v. Kezer*, 20 F.3d 68, 72 (2d Cir. 1994); *see also Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmbH*, 2015 WL 5051769, at *4 (S.D.N.Y. 2015), *aff'd*, 843 F.3d 48 (2d Cir. 2016). U.S. Bank does not contend that it will be harmed from a stay. PIMCO, however, raises several theories of injury.

PIMCO first argues that "there is . . . a significant cost associated with the time-value of money related to delay in receiving proceeds from the sale." PIMCO Br. at 7. PIMCO claims that if the Court imposes a stay, "it will lose its ability to use or invest the money" it would obtain from the sale. *Id.* at 22. At core, this is an argument about opportunity cost. Any such injury, however, is speculative. PIMCO provides no basis for the Court to know that it faces a financial loss by having its funds tied up in the Disputed Securities. Indeed, the Movants note that PIMCO has received "every scheduled payment of principal and interest to which it is entitled under the Indentures" and benefits from "an accelerated, priority repayment of its principal under the Indentures' payment waterfall." Movants Br. 10. This theory of injury

9

instead rests on a premise that PIMCO can use the funds from the sale to achieve greater returns than it receives from its notes. However, this is purely conjectural, and PIMCO has provided no basis for its theory. As PIMCO itself notes, "mere speculation" that harm might occur is insufficient. *In re Trusteeship Created by LNR CDO IV, Ltd.*, 2014 WL 407021, at *2 (S.D.N.Y. Feb. 3, 2014). The Movants have thus met their burden to show that this theory of harm fails.

PIMCO also argues that it "has spent, and continues to spend, considerable time, resources and attorneys' fees litigating this matter." PIMCO Br. at 24. The Court rejects this argument. If fees were sufficient to show substantial injury, then this factor would always favor the non-movant. PIMCO cites no authority for the proposition that attorneys' fees spent litigating an appeal constitute an injury, let alone a substantial one.

Finally, PIMCO raises a concern about "leakage." It argues that as time passes, the Disputed Securities deteriorate in value. Two factors contribute to this leakage. First, the CDOs make "interest payments to junior shareholders such as Serengeti that otherwise should be used to pay PIMCO's principal." *Id.* at 23. Second, Triaxx bills U.S. Bank for various "administrative expenses" in performing its duties as collateral manager. *Id.* As time goes on, argues PIMCO, these factors deteriorate the value of the Disputed Securities. And this "leakage represents value that otherwise should be going to PIMCO in the form of sale proceeds." *Id.* at 8. PIMCO claims that this problem is especially acute because one of the two CDOs, Triaxx 2007-1, "lacks sufficient assets to pay the full outstanding principal balance of the Notes that PIMCO holds." *Id.* 23-24. The more time that passes, says PIMCO, the less it will be paid if the Disputed Securities are sold.

PIMCO is correct that it suffers risk of injury through leakage. The Movants point out that one of the CDOs is sufficiently collateralized to repay all principal and interest owed on

PIMCO's notes if liquidated. Movants Reply Br. at 5. But the other CDO, Triaxx 2007-1, lacks sufficient assets to pay the full outstanding balance on its notes. *Id.* Indeed, the Movants fail to explain why continued payments from Triaxx 2007-1 to junior noteholders and related administrative expenses do not harm PIMCO. The Movants contend that PIMCO assumes "that [Triaxx 2007-1] may <u>subsequently</u> have sufficient assets to repay all principal on PIMCO's notes based on appreciation and/or subsequent recoveries." Movants Reply Br. 5. In other words, the Movants argue that leakage does not harm PIMCO because, no matter the outcome of this motion, PIMCO will be in the red on Triaxx 2007-1. But this is no response at all. PIMCO will be injured through leakage even if it will never be made whole from Triaxx 2007-1. The more time that elapses, the more the value of Triaxx 2007-1 decreases, and thus the *less* PIMCO will be paid in the event of a sale. And as PIMCO explains, and the Movants do not dispute, this leakage amounts to hundreds of thousands of dollars. PIMCO Br. at 23. PIMCO will therefore face substantial injury if the Court imposes a stay.

### D. A Stay is Not Warranted

The parties contend that the fourth factor, public interest, has little bearing here. The Court agrees, and thus considers whether the other three factors, taken together, warrant a stay. No single factor is dispositive to this inquiry. *See UnitedHealthcare of New York, Inc. v. Vullo*, 2018 WL 4572243, at *1 (S.D.N.Y. 2018) ("Consideration of these factors is holistic; a weak showing on one factor can be counterbalanced by a strong showing on another."). But the Supreme Court has made clear that irreparable injury alone does not require a stay. *Virginian R. Co.*, 272 U.S., at 672. ("A stay is not a matter of right, even if irreparable injury might otherwise result."); *see also Nken*, 556 U.S. at 438 ("demonstration of irreparable harm, without more, is [not] sufficient to justify a stay.").

To be sure, Serengeti has demonstrated that it will be irreparably harmed absent a stay. If the Disputed Securities are sold and the Second Circuit reverses this Court's decision, a future court would not be able to reinstate the status quo ante. However, imposing a stay will substantially injure PIMCO, because the Disputed Securities continue to deteriorate in value. The Movants have also failed to demonstrate a likelihood of success on appeal, as the Edge Act creates jurisdiction over this action. Taking these factors together, the Court concludes that a stay is not warranted.

## IV. CONCLUSION

The Court hereby denies the Movants' motion to stay enforcement of the Court's September 16, 2019 Order. This resolves Dkt. Nos. 162 and 170.

SO ORDERED.

Dated: January 21, 2020
      New York, New York

_____
ALISON J. NATHAN
United States District Judge